Arthur CLARK, Plaintiff-Appellant,

v.

The PENNSYLVANIA RAILROAD COM-
PANY, Defendant-Appellee.

No. 184, Docket 28441.

United States Court of Appeals
Second Circuit.

Argued Nov. 19, 1963.

Decided Feb. 14, 1964.

Melvin A. Cohen, New York City (Bromsen & Gammerman, New York City, on the brief), for plaintiff-appellant.

Thomas V. McMahon, New York City (Myron D. Cohen and Conboy, Hewitt, O'Brien & Boardman, New York City, on the brief), for defendant-appellee.

Before MEDINA, WATERMAN and MARSHALL, Circuit Judges.

MEDINA, Circuit Judge.

Arthur Clark, employed by the Pennsylvania Railroad Company as a buffet lounge attendant, appeals from a judgment entered on a jury verdict for defendant in an action under the Federal Employers' Liability Act, 45 U.S.C. § 51 et seq. The claim by appellant is that he was denied a fair trial because Judge Rosling: (1) refused to grant a certain request for instructions on the subject of assumption of risk; (2) was not sufficiently explicit in his instructions relative to proximate cause; (3) received in evidence over objection a certain map as an exhibit without eliminating certain marks indicating street lights; and (4) permitted the Railroad over appellant's objection to introduce the testimony of two witnesses whose names were not included in the list of prospective witnesses alleged to be required by the Rules of the District Court for the Eastern District of New York to be filed as part of the pre-trial procedure of that Court. We find no error and we affirm.

Clark was in the employ of the Railroad as a bar lounge attendant and was working on the run between Jersey City and Point Pleasant, New Jersey. In April of 1958 the schedule to which Clark was assigned required his presence at the Bay Head Junction Yard at 4:30 A.M., long before sunrise. To accommodate the men who reported for work in darkness at this early hour, far from their homes, the Railroad provided overnight crew quarters. The place where Clark was to sleep was a boarding house at 500 McLean Avenue in Point Pleasant, New Jersey. On two afternoons just prior to the accident Clark returned to this boarding house while it was still light, and he observed that access to the house was by three wooden steps leading to a screened porch. To enter the house it was necessary to go up the steps, open the screen door, proceed across the small screened porch and open the main door leading to the quarters inside the house. There was another set of three wooden steps on the opposite side of the screened porch, but this set of steps is only of peripheral consequence.

Two other fellow workers also spent the night at 500 McLean Avenue, Lucius K. Morris, one of Clark's witnesses at the trial, and another man who was not called as a witness by either party. On the morning of April 15, 1958, the day before the accident, Clark came out of the house with Morris, who had a flashlight and, with the assistance of the flashlight, they both went down the steps, entered the taxicab provided by the Railroad and reached their destination on time. On April 16, 1958 Clark heard the taxi driver blowing his horn and he assumed that Morris had gone ahead and was already in the cab. As a matter of fact Morris, who was holding his flashlight in his hand, was still inside the house. Clark then went through the screened porch, opened the door and started to go down the steps. As he said, he missed the first step and fell, receiving the injuries complained of.

The simple factual issues related to the condition of the wooden steps and the amount of light afforded by whatever means were available for the purpose. While there is some talk about a slight defect in one of the steps, as shown in the photographs received in evidence, the real alleged defect relied on by Clark was the absence of any railing on either side of the steps. Morris testified no lighting was provided near the steps and that there were no lights inside the porch. He insisted the only street light in the vicinity was on the McLean Avenue corner, 125 feet away. Clark admitted he did not look for any light fixtures inside the screened porch, but he said he noticed the light up on the corner. He denied there was any street light directly across the street from 500 Mc-Lean Avenue.

## I

Against this simple factual background we shall first address ourselves to what we consider to be the most interesting and important question in the case, Judge Rosling's ruling construing or amending the pre-trial order in the exercise of his judicial discretion and receiving the testimony of the two witnesses whose names had been omitted from the Railroad's pre-trial statement. The question arose on the second day of the trial during the direct examination of Clark. Feeling some concern over the omission to include the names of the two witnesses, trial counsel for the Railroad, having previously notified his opponent of his intention to do so, moved to amend the pre-trial order so as to include the two additional names. When Judge Rosling became aware of the fact that the two witnesses were to testify concerning the physical location of lighting facilities of some permanence, and read the pre-trial statement of the Eastern District requiring no enumeration of witnesses to be called in "rebuttal," he ruled that this was rebuttal and also that, in any event, in his discretion he would allow the witnesses to be called. He added:

"The Court: Well, I don't construe the pretrial order that strin-

gently. It wouldn't make sense. That's a physical condition of some measure of permanence, and I will permit you to introduce a witness, whether it is rebuttal testimony or exercising my discretion to permit such testimony be introduced.

"Of course, if your adversary is able to indicate that he was surprising him, and he moves for a mistrial or adjournment, I will take it under advisement."

The matter came up again the following day, prior to the calling of the two witnesses, and Judge Rosling again offered Clark's counsel a reasonable adjournment if he desired to have one because of any surprise.

As counsel seemed to be more interested in throwing out an anchor to windward, in the event of an adverse verdict and an appeal, than he was to procure a continuance for the purpose of investigating the facts or the prospective witnesses, he remained silent. There was no motion for a mistrial and no request for an adjournment.

The wisdom of Judge Rosling's ruling was apparent when the two witnesses testified. George T. Chapman, a building and license inspector for Point Pleasant Beach, produced a map, later received in evidence, and he testified that there were two street lights, one on the corner of McLean Avenue, by actual measurement 100 feet from the steps where Clark fell, and another on the opposite side of the street from the steps only 60 feet away. This is the one Clark insisted did not exist. Chapman testified that to his personal knowledge these lights had been there for ten years prior to the accident. Marian L. Lufft, employed as an inspector by the Borough of Point Pleasant Beach, testified she inspected the premises at 500 McLean Avenue on June 16, 1958, that there were two electric light fixtures in the ceiling on the screened porch, one just above the steps used by Morris and Clark, and another just above the steps leading from the other side of the porch. She also testified that during April, 1958 she had

observed these porch lights to be on as she passed by.

Thus it need not surprise us that counsel for Clark evinced no enthusiasm for a continuance to check the facts as testified to by these witnesses or the witnesses themselves. Despite the testimony of Clark and Morris, it was now pretty clear that light was available and that the fixtures on the porch and the lights on the street had been there for a long time.

In the heyday of Common Law Pleading, when each of the numerous technicalities involved provided the members of the bench and bar with a source of continual intellectual amusement and pleasure, the sporting theory of justice prevailed. To win a lawsuit by guile and surprise or by the skillful manipulation of mysterious rules, understood only by the elite, was quite the thing to do. The development of pre-trial procedure and the formulation of Rule 16 of the Federal Rules of Civil Procedure, and similar provisions in most if not all of the States, represents one of the great Twentieth Century contributions to the improvement of judicial administration and the furtherance of effective, timely justice. One of the prime objectives of this new, but now firmly established procedural device, is to do away with the old sporting theory of justice and substitute a more enlightened policy of putting the cards on the table, so to speak, and keeping surprise tactics down to a minimum. With this in mind many courts throughout the country have required some specification by the parties of the identity of the witnesses to be called.

The more general rule is the one in force in the United States District Court for the Southern District of New York, where each party must file a pre-trial memorandum including, among other items, "A list of the witnesses which each party intends to call, along with the specialties of experts to be called." The Eastern District rule that governs this case requires "Separate lists of the witnesses whom each party will call at the trial of the action, distinctly identifying those witnesses to be called as experts." One of the provisions included in all Eastern District pre-trial orders is: "There is reserved to each party the right to call such rebuttal witnesses as may be necessary without previous notice thereof to the adversary party or parties."

The word "rebuttal" is equivocal and we think the judges in the Eastern District of New York might well consider changing their rule to make it conform to the practice in the Southern District of New York. Moreover, the pre-trial order in this case contains the provision almost universally adopted or implied:

"IT IS ORDERED that this Pre-Trial Order may be modified at the trial of the action, or prior thereto, to prevent manifest injustice, and that such modification may be made either on the application of counsel for the parties or on motion of the Court; * * *"

Whatever the phraseology of the rule in a particular federal District Court, it is a fundamental principle of pre-trial that this procedure be flexible, with power reserved to the trial judge to amend the order or permit a departure from strict adherence to the pre-trial statements of either party, when the interests of justice make such a course desirable. Otherwise a pre-trial order or pre-trial statements would hold the parties in a vise, and the result might be just about as bad as a return to the old sporting theory of justice. See Scott v. Spanjer Bros., Inc., 2 Cir., 1962, 298 F.2d 928. Of course a ruling amending the pre-trial order or permitting a departure by any party from his pre-trial statement may be reviewed for abuse of discretion. But there is clearly no abuse of discretion here.

On the other hand, in a case, for example, where a party springs a surprise witness on his adversary in defiance of the terms of a pre-trial order or statement, and the circumstances indicate bad faith and an intent to take some unfair advantage, the trial judge again has ample power to deal with the situation.

He may exclude the testimony, Matheny v. Porter, 10 Cir., 1946, 158 F.2d 478, 480; Globe Cereal Mills v. Scrivener, 10 Cir., 1956, 240 F.2d 330, 335; Texas & Pacific Ry. v. Buckles, 5 Cir., 1956, 232 F.2d 257, 260, cert. denied, 351 U.S. 984, 76 S.Ct. 1052, 100 L.Ed. 1498, grant a continuance or declare a mistrial, assessing costs and perhaps a counsel fee against the lawyer who acted in bad faith in calling such a witness. In a flagrant case no amount of reasonable adjournment, with a jury present, would be of any avail. In other words, the common law powers of the trial judge are preserved intact, but what is to be done in a particular case depends upon the facts and circumstances of that case, and the rulings when made are always subject to appellate review for abuse of discretion. See Meeker v. Rizley, 10 Cir., 1963, 324 F.2d 269; Syracuse Broadcasting Corporation v. Newhouse, 2 Cir., 1959, 271 F.2d 910, 915.

## II

It was not error to refuse to grant the following request for instructions to the jury on the subject of assumption of risk:

> "Assumption of risk is not available as a defense, either in whole or in part, to the defendant railroad. Therefore, if you find that the plaintiff's injury resulted in whole or in part from the negligence of the defendant, the plaintiff himself shall not be held to have assumed the risk of his employment, his employment including the use of the crew quarters, provided to him by defendant. That is, plaintiff's recovery, if you find he is entitled to such recovery, shall in no way be diminished by the fact that he may have been aware of the defective condition of the steps and the lack of adequate lighting and used the crew quarters in any event. Plaintiff does not assume the risks attendant upon the use of those quarters if you find that defendant was negligent in fail-

ing to provide him with reasonably safe quarters for his use."

To begin with, the inclusion of the statement that Clark's recovery "shall in no way be diminished by the fact that he may have been aware of the defective condition of the steps and the lack of adequate lighting" made the instruction as requested tantamount to the elimination of the defense of contributory negligence from the case. Thus the instruction was properly refused, as the rule is that a failure to grant a request for instructions that are in any respect incorrect and unsound does not constitute error.

On the merits, however, there was no occasion for the giving of any instruction whatever on the subject of assumption of risk. Quite aware of the confusion that would have resulted had the subject been adverted to in a case where the defense as pleaded and as strongly relied upon at the trial was contributory negligence, Judge Rosling resorted to the expedient of instructing the jury first to decide the question of the negligence or lack of negligence on the part of the Railroad and the amount of damage suffered by Clark as a result thereof, before addressing themselves to the separate subject of contributory negligence in possible mitigation of damages. As the verdict was for the Railroad, it is extremely improbable that the jury ever reached the only issue to which assumption of risk would have any relevancy.

Ordinarily it is a mistake to give instructions on subjects not directly in issue in a case. Occasionally, however, for the purpose of clarification, it is proper or even necessary to explain how some apparently similar situation is really different. DeLima v. Trinidad Corporation, 2 Cir., 1962, 302 F.2d 585, strongly relied upon by appellant, illustrates a situation in which an instruction on assumption of risk is proper, by way of contrast to the present case in which such an instruction is not proper because it might well cause such confusion as to water down or even eliminate the issue of contributory negligence.

DeLima was a seaman. He slipped on an accumulation of oil on the floor of the fireroom where he worked as a combination fireman-watertender. The action was under the Jones Act, with the usual alternative allegation of unseaworthiness. The trial judge had fallen into the familiar error of including references to the duty of the shipowner only to use reasonable care in providing a sufficient number of crew members to wipe up oil on the floor of the fireroom. In emphasizing the rule that the liability of the shipowner for unseaworthiness is absolute and not dependent on fault, we held that the particular circumstances of that case made it necessary to give the requested instruction on assumption of risk "to avoid confusion in the jury's mind." Without such a complementary instruction the jury might have thought the duty to provide a seaworthy vessel was less than absolute.

The circumstance that assumption of risk was not pleaded as a defense is quite irrelevant to the subject we have just discussed. If such a defense had been pleaded, it would on motion have been stricken as insufficient in law on its face.

## III

The other alleged errors require little discussion. There was no objection to the instructions on the subject of proximate cause. While the trial judge did not use the traditional formula, we think his meaning was clear, especially in the light of the fact that he pointed out that defects in the sleeping quarters upstairs in the boarding house would not be a proximate cause of Clark's falling as he went down the steps.

The markings on the map produced by the witness Chapman were merely for the purpose of indicating where the lights were and not for the purpose of indicating that the lights were on in the early morning hours of April 16, 1958. As he explained in his testimony, Chapman was not at the scene on the day of the accident and he had no personal knowledge on the subject of whether or not these lights were then functioning properly. It was not error to receive the exhibit without removing the allegedly objectionable markings.

Affirmed.